

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

**FILED**

MAY 0 1 2002

LARRY W. PROPES, CLERK
CHARLESTON, SC

1  02  1426-22

)
**JIM HODGES, Governor of the State of South** )
**Carolina, in his official capacity,** )
)
)
**Plaintiff,** )
)
**v.** )  2002-CIV-___
)
**SPENCER ABRAHAM, Secretary of the Department** )
**of Energy, in his official capacity, and the UNITED** )
**STATES DEPARTMENT OF ENERGY,** )
)
**Defendants.** )
)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, Jim Hodges, Governor of the State of South Carolina, alleges as follows:

## INTRODUCTION

1.  By this action, South Carolina Governor Jim Hodges challenges the decision of the Department of Energy (DOE) to send surplus plutonium to the Savannah River Site (SRS) near Aiken, South Carolina.  Over the last approximately five years, an arrangement was made between South Carolina and DOE whereby surplus plutonium would be sent to SRS as a part of a program to treat the plutonium there and then remove it to another location.

2.  DOE has in the last year given indication that the surplus plutonium destined for SRS may not be treated and then removed, but rather left there in long-term storage. Governor Hodges sought assurances from DOE that treatment and removal would in fact occur.  Secretary of Energy Spencer Abraham provided such assurance in several letters

written to Governor Hodges in April 2002, but refused to include this commitment in an enforceable agreement.

3. Then, on April 19, 2002, DOE issued an amended Record of Decision (ROD) on the surplus plutonium program that named SRS as the site for consolidated long-term storage of plutonium and made this storage independent of its treatment or processing.

4. Despite the abruptness and magnitude of the change, DOE claims in the amended ROD that the decision requires no further analysis under the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321 *et seq.*

## JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 5 U.S.C. § 702 (the Administrative Procedures Act).

6. This Court may grant declaratory relief, injunctive relief, and any additional relief pursuant to 28 U.S.C. § 1361 (mandamus), and 28 U.S.C. §§ 2201 and 2202 (declaratory judgment).

7. Venue in this Court is proper under 28 U.S.C. § 1391.

8. An actual, justifiable controversy exists now between the parties in which plaintiff is entitled to the relief sought herein to redress the harm plaintiff would otherwise suffer.

## PARTIES

### A.    Plaintiff

9. Plaintiff Jim Hodges is the Governor of the State of South Carolina. In that capacity, plaintiff Hodges is the chief magistrate and supreme executive authority of the State of South Carolina. He is responsible for the safety and welfare of the citizens of

South Carolina and for the protection of the State's natural resources.  He is authorized to take such measures and actions necessary to prevent harm to the persons and property of South Carolina.  Plaintiff Hodges officially resides in Columbia, South Carolina, and is suing in his official capacity.

B.    **Defendants**

10. Defendant Spencer Abraham is the Secretary of DOE.  In that capacity, defendant Abraham is responsible for the administration, operations, and activities of DOE, including the administration of the plutonium disposition program at SRS. Defendant Abraham officially resides in Washington, D.C., and is sued in his official capacity only.

11.  Defendant DOE is charged with responsibilities in connection with the production of nuclear materials for the weapons program and their disposition, including activities in that regard at the SRS.  DOE is an executive department of the United States government.

## FACTUAL BACKGROUND

### Plutonium

12.  Plutonium is a highly radioactive, metallic element.  Although it is virtually non-existent in nature, plutonium has been produced in large quantities by processing uranium fuel in nuclear reactors.  Plutonium can exist in approximately fifteen different variations, called isotopes, but only one, plutonium 239, is used to manufacture the explosive triggers, or "pits," at the core of modern nuclear weapons.  Plutonium 239 can also be processed to form a powdery oxide that can be mixed with uranium dioxide to

3

form mixed-oxide ("MOX") fuel for use in nuclear reactors. All subsequent references to plutonium in this complaint are to plutonium 239.

13. Plutonium's radioactive qualities make it an extremely hazardous substance. Ingestion or inhalation of any amount of plutonium can cause cancer and other adverse health effects. When ingested, plutonium can enter the blood stream and concentrate in the liver, on bone surfaces, and in bone marrow, where it repeatedly bombards nearby cells with large amounts of radiation. When inhaled, plutonium will reside in the lungs, and it has been estimated that inhaling a few micrograms of plutonium would have a 100% probability of causing fatal cancer. Plutonium can also be absorbed directly into the bloodstream through cuts and abrasions.

14. Even a relatively small quantity of plutonium has the potential to reach a "critical mass." A critical mass occurs when plutonium is configured in such a way that its radiation cannot escape into the environment and instead triggers more radiation, causing a self-sustaining chain reaction. A critical mass of plutonium would release an intense amount of radiation that could be lethal to humans and would lead to serious environmental contamination. The amount of plutonium necessary to achieve critical mass is approximately four kilograms.

15. Plutonium has a "half-life" of 24,000 years, meaning that it takes 24,000 years for half of a given amount of plutonium to decay into a different element. After two half-lives, there would be one-fourth of the plutonium that was contained in the original sample, after three half-lives, one-eighth, and so forth. As a general rule of thumb, a radioactive element's hazardous life is ten times its half-life. Accordingly, the plutonium in existence today will be hazardous for at least 240,000 years.

## Surplus Plutonium Disposition Program

16. In a federal register notice of December 12, 1995, DOE issued a ROD on interim management of nuclear materials at SRS in which it decided to construct a new facility, the actinide packaging and storage facility, to prepare, package, and store plutonium oxide and metal. 60 Fed. Reg. 65800.

17. In a federal register notice of January 21, 1997, DOE issued a ROD on the storage and disposition of weapons-usable fissible materials. In that ROD, DOE made the decision to dispose of surplus plutonium through the dual or hybrid process of immobilization and MOX fuel production. 62 Fed. Reg. 3014. The ROD stated that the dual approach was warranted "by the increased flexibility it would provide . . . to ensure the plutonium disposition could be initiated promptly should one of the approaches ultimately fail or be delayed." 62 Fed. Reg. 3028.

18. Under the immobilization approach, plutonium would be immobilized in a ceramic form, sealed in cans, which would be placed in canisters over which would be poured high-level waste glass. These radioactive canisters would be disposed of in a geologic repository. The MOX approach would produce MOX fuel that could then be used in existing domestic, commercial reactors. The irradiated MOX fuel would also be disposed of in a geologic repository.

19. DOE also stated in the January 21, 1997 ROD that the Rocky Flats weapons usable plutonium would be moved to the actinide packaging and storage facility that would be built at SRS. 62 Fed. Reg. 3026. According to the ROD: "The decision to store non-pit plutonium from RFETS [Rocky Flats] at SRS places most non-pit material at a plutonium-competent site with the most modern, state-of-the-art storage and

processing facilities . . . ." 62 Fed. Reg. 3027. The reference was to the actinide packaging and storage facility that was planned for SRS.

20. The January 21, 1997 ROD made transport of surplus plutonium from Rocky Flats to SRS contingent on DOE selecting SRS as the site for the immobilization facility.

21. In a federal register notice of August 13, 1998, DOE amended the ROD on storage and disposition of weapons-usable materials to expand the actinide packaging and storage facility and prepare additional suitable storage space in building 105-K for surplus weapons-usable plutonium. 63 Fed. Reg. 4338. DOE stated that safeguards and security features would be upgraded, criticality monitoring devices installed, structural features repaired, roof vents added, and doors modified. It also noted that under the previous ROD, plutonium from Rocky Flats would be stored at SRS, pending disposition, provided that SRS was selected as the immobilization site. Finally, it noted that the transfer of plutonium from Rocky Flats to SRS would begin when the actinide packaging and storage facility was completed. 63 Fed. Reg. 43387-43388.

22. In January, 1999, DOE suspended the actinide packaging and storage facility project.

23. In a federal register notice of January 11, 2000, DOE issued a ROD specifically on surplus plutonium disposition at SRS. 65 Fed. Reg. 1608. DOE discussed immobilization and MOX, noting:

Immobilization technology has some advantage over the reactor technology
[MOX] in avoiding the perception that the latter approach could potentially
encourage additional separation and civilian use of plutonium, which itself poses
proliferation risks. Because reactor technology results in accountable "items" (for

purposes of international safeguards) whose plutonium content can be accurately measured, this approach offers some advantage in accounting to ensure that the output plutonium matches the input plutonium from the process. The principal uncertainty with respect to using excess weapons plutonium as MOX fuel in domestic reactors relates to the potential difficulty of gaining political and regulatory approvals from the various operations required. [66 Fed. Reg. 1618 – 1619.]

24. Further, DOE stated in this ROD: "Pursuing both immobilization and MOX fuel fabrication also provides important insurance against uncertainties of implementing either approach by itself. The construction of new facilities for the disposition of surplus U.S. plutonium would not take place unless there is significant progress on plans for plutonium disposition in Russia." 66 Fed. Reg. 1620.

25. Congress has in numerous reports tied the United States plutonium disposition program to the Russian program, stating in a Conference Report for instance:

The Department of Energy should proceed with preparations for plutonium disposition to include the design and licensing of key disposition facilities as well as qualification of mixed oxide fuel. The United States, however, should not proceed unilaterally to dispose of excess plutonium without parallel progress on the Russian side. No funds have been provided to initiate actual construction of plutonium disposition facilities without such agreement.

[Conf. Rep. No. 749, 105th Cong. 2d Sess. 110 (Sept. 25, 1998).]

26. In a letter of April 26, 2002 from John Gordon of DOE to Congressman Lindsey Graham, DOE expressly noted that the United States program to dispose of

surplus weapon-grade plutonium was linked with the comparable Russian program and would only proceed in parallel to it.

27.  In July 2000, DOE issued an evaluation of SRS plutonium storage and stabilization options (July 2000).  It recommended that the actinide packaging and storage facility be cancelled and that stabilization and packaging capability be installed at SRS.  Further, the evaluation recommended that DOE continue with the decision to transfer Rocky Flats stabilized plutonium for storage in K-Area Materials Storage (KAMS).

28.  In a federal register notice of January 26, 2001, DOE issued an amended ROD on interim management of nuclear materials canceling the actinide packaging and storage facility project and designating KAMS for plutonium storage.  66 Fed. Reg. 7888.

29.  In a letter of November 21, 2001, the Defense Nuclear Facilities Safety Board stated K-Reactor facility "is an aged facility and was never intended to provide more than interim storage."

30.  A document prepared in 1999 by Westinghouse Savannah River Company, a DOE contractor for SRS, stated that KAMS has "no design features in place to mitigate a release of plutonium (i.e. HEPA filters, facility containment boundaries, etc.)."

31.  On January 23, 2002, DOE announced a dramatic change in the plutonium disposition program.  In a press release of that date, DOE stated it would eliminate the immobilization component of the program and proceed exclusively by way of the MOX technology.   The enormous change in direction was emphasized by the press release's statement:  "The decision on plutonium disposition comes after a thorough reexamination of more than 40 disposition alternatives . . . ."

32. The changes, if ultimately implemented, would mean that more surplus plutonium would have to be treated through the MOX technology including plutonium that was previously considered too contaminated to be treated through that approach.

33. On February 15, 2002, DOE submitted a report to Congress on the disposition of surplus defense plutonium at SRS. The report stated that 6.4 metric tons of impure plutonium, previously intended for immobilization, would instead be purified using enhanced aqueous polishing in the MOX fuel fabrication facility and converted to MOX fuel. Report at ES-3.

34. DOE provided a schedule for implementing the MOX processing at SRS in the report to Congress which includes the following milestones: NRC licensing - FY 2000-2005; construction - FY 2007; first MOX fuel fabricated - FY 2008; full-scale operations - FY 2007- 2019; and deactivation-FY 2020. The report notes with regard to scheduling: "As a result of reductions in the program's FY 2002 budget, several adjustments to the pu [plutonium] disposition program plans were required." Report at 2-1.

35. In February, 2002, DOE issued a Supplement Analysis (SA) for the storage of surplus plutonium in the K-Area at SRS. It noted that in light of the cancellation of the actinide packaging and storage facility and the elimination of the immobilization program that storage of plutonium materials in KAMS "beyond 10 years may be needed."

36. The SA discussed the potential impacts associated with the storage of surplus plutonium materials from Rocky Flats and other sites beyond 10 years at KAMS pending disposition and concluded that the potential impacts had been analyzed in previous NEPA documents. Further the SA stated: "Storage of these materials would not constitute a

substantial change in actions previously analyzed and would not constitute significant new circumstances or information. . . ."

37.  In the last few months, DOE has announced inconsistent numbers of metric tons of plutonium materials previously slated for immobilization as not being suitable for MOX treatment.

38.  An April 4, 2002 document prepared by the Kaiser-Hill Company, DOE's contractor for the Rocky Flats cleanup, showed that 3.13 metric tons of plutonium previously intended for immobilization from Rocky Flats has no pathway to disposal.

39.  A recent letter from Eric Leads of the Nuclear Regulatory Commission to Peter Hastings of Duke Engineering, COGEMA, Inc., and Stone & Webster (a DOE contractor group on the MOX program) makes it clear that the NRC believes that the recent changes made to the plutonium disposition program are substantial and require new environmental analysis.  The Nuclear Regulatory Commission is responsible for licensing the facilities at SRS that need to be constructed to process the surplus plutonium.

### Secretary Abraham's Commitment to Treat Plutonium, Rather Than Just Store It, and DOE's Breach of that Commitment

40.  After a cut in funding for the plutonium disposition program and the announcement that immobilization would be eliminated, Governor Hodges became concerned that surplus plutonium sent to SRS would not be treated and removed as previously planned.  He communicated those concerns to Secretary of Energy Abraham.

41.  On April 11, 2002, Secretary Abraham wrote to Governor Hodges stating: "As I have indicated in our various personal meetings and phone conversations, I appreciate your concerns that any plutonium that comes into the State have a credible

pathway out. That is why when we spoke on February 23, I personally assured you that our new approach would not transport any plutonium to South Carolina unless our plans for fabricating it into MOX fuel were progressing in a fashion that assured that it would be able to be disposed of through this process."

42. Additionally, Secretary Abraham stated in the letter that DOE had made a commitment to South Carolina of constructing the MOX facility as well as a "commitment to maintain a pathway out of South Carolina for any plutonium brought into the State, including firm dates by which such material would be removed from the State if DOE, for any reason, were to be unable to secure the funding necessary to build the MOX facility."

43. Further, Secretary Abraham stated that Governor Hodges' efforts on behalf of South Carolina was undermining "important international and domestic priorities of the United States." According to Secretary Abraham, further delay "will undermine the U.S. plutonium disposition agreement with Russia."

44. Also, on April 11, DOE faxed to Governor Hodges a draft amended ROD for the surplus plutonium disposition program that stated: "Under this amended ROD . . . DOE/NNSA will begin taking actions necessary to disposition of up to 33 metric ton (t) of surplus plutonium by fabricating it into mixed oxide (MOX) fuel." Draft amended ROD at 2.

45. In discussing the surplus plutonium that would be moved from sites other than Rocky Flats to SRS, DOE stated that as with the Rocky Flats plutonium materials, "only those materials originally part of the feedstock for the MOX facility will be shipped

11

and the shipments will be made in a manner consistent with the terms of DOE's agreement with South Carolina." Draft amended ROD at 2.

46. The draft amended ROD acknowledged that previous RODs placed as a condition for Rocky Flats plutonium being sent SRS that the immobilization facility be built at SRS (draft amended ROD at 1 and 6), but found it sufficient to cancel this condition on the basis that DOE was required to meet "a set of milestones for the construction of a MOX plant that are set out in an agreement between the Department and the State of South Carolina." Draft amended ROD at 1.

47. Also, on April 11, 2002, Steve Bates, legal counsel to Governor Hodges, wrote to Lee Otis of DOE's Office of General Counsel and stated that Governor Hodges would sue DOE to prevent shipments of surplus plutonium to SRS if DOE made a unilateral decision to make the shipments. Mr. Bates stated that the grounds of the lawsuit would be that a supplemental environmental impact statement (EIS) was required for the revised surplus plutonium strategy that eliminated immobilization and thereby relied exclusively on the MOX technology.

48. Secretary Abraham wrote to Governor Hodges again on April 12, 2002, thanking Governor Hodges for accepting the terms of the agreement DOE had offered South Carolina on shipping surplus plutonium to SRS, but criticizing Governor Hodges for insisting on making a "means of enforcing these commitments." Secretary Abraham asserted that the signed agreement should address Governor Hodges' concerns, "since that is the kind of commitment that an Administration walks away from unilaterally only at considerable political peril."

49. Further, Secretary Abraham stated: "I hope that rather than electing to throw this matter into litigation, thereby vastly complicating its resolution, you will reconsider, accept the proposal I have offered, sign the proposed agreement which I believe gives you very substantial protection against a unilateral change of course . . . ."

50. But a few days later an order of the Nuclear Regulatory Commission came to light that revealed it was far from certain that the MOX program would proceed.  The order was issued on April 12, 2002 in the re-licensing proceeding of Duke Energy Corporation's McGuire and Catawba nuclear facilities, which facilities are proposed to be used in the MOX program.  Specifically, those facilities would burn the MOX fuel fabricated at SRS.  In that order, the Nuclear Regulatory Commission stated that Duke Energy's possible application to file for permission to burn the MOX fuel was speculative.  Order at 25.

51. The Nuclear Regulatory Commission stated it found no reason to doubt the following statement in the proceeding by Duke Energy:

Duke is currently participating in an international program to reduce stockpiles of surplus weapons plutonium in the United States and Russia.  This program may eventually involve the use of MOX fuel at McGuire and/or Catawba.  However, the future use of MOX fuel at McGuire and Catawba reactors is not a certainty. Substantial uncertainties and contingencies continue to surround the program. [Order at 25.]

52. DOE issued the amended ROD in final in a federal register notice of April 19, 2002.  It was, however, dramatically different from the draft DOE had sent to Governor Hodges eight days earlier.  The amended ROD announced the "immediate

13

implementation of consolidated long-term storage at the Savannah River Site (SRS) of

surplus non-pit plutonium now stored separately at the Rocky Flats Environmental

Technology Site (RFETS) and SRS. . . ." 67 Fed Reg. 19432.

53.  The amended ROD stated that MOX processing, which Secretary Abraham

had presented to Governor Hodges as a certainty, was to be reviewed "pursuant to the

National Environmental Policy Act (NEPA).  No final decisions regarding the MOX

portion of the program will be made until these reviews are completed."  69 Fed. Reg.

19432.

54.  Whereas Secretary Abraham had guaranteed that the shipment of surplus

plutonium to SRS was strictly tied with processing it there, the amended ROD stated:

> In addition to achieving the ultimate goal of permanent disposition of surplus
>
> plutonium materials, DOE independently needs to improve the configuration of
>
> the storage system for these materials pending disposition.  These improvements
>
> will allow DOE to significantly reduce storage costs, expedite closure and cleanup
>
> of sites and facilities in its nuclear complex, and enhance the security of these
>
> materials.  [69 Fed. Reg. 19433; emphasis supplied.]

There was no reference, as before, to the need to proceed to honor the commitments to

Russia, since the storage was made independent of its processing.

55.  Further, demonstrating the separation of the shipment of surplus plutonium to

SRS from its processing, the amended ROD added as a new heading "Consolidated

Long-term Storage of Plutonium at SRS," and under it stated:

> Canceling the U.S. immobilization program has caused DOE/NNSA to reevaluate
>
> the long-term storage needs of the DOE nuclear complex.  Much of the non-pit

surplus plutonium currently stored at various sites in the complex was originally

destined for immobilization.  DOE/NNSA is examining alternative disposition

paths for this material, including use as MOX fuel . . . .  In the meantime,

however, DOE needs to move forward with consolidated storage of some of this

material, which serves independent objectives.  In particular, DOE must

consolidate the plutonium in order to close and clean up facilities and sites in the

complex. . . .  Shipments from RFETS [Rocky Flats] must begin soon in order to

maintain that schedule.  [69 Fed. Reg. 19434.]

56.  Additionally, the ROD asserted: "Canceling the immobilization

portion of the U.S. surplus plutonium disposition program removes the basis for the

contingency contained in the January 21, 1997, ROD for the Storage and Disposition

PEIS [Programmatic EIS] that SRS be selected as the site for the immobilization facility

before DOE transports surplus plutonium from the RFETS [Rocky Flats] to SRS."

Amended ROD at 9.

57.  In a federal register notice of April 24, 2002, the Nuclear Regulatory

Commission announced that it was postponing preparation of an EIS on the proposed

MOX fuel fabrication facility at SRS.  67 Fed. Reg. 20183.  The notice stated:

NRC staff decided this schedule needed to be changed when, in January 2002, the

U.S. Department of Energy (DOE) announced its decision to alter its planned

hybrid approach for surplus weapons plutonium disposition. . . .  DOE's decision

not to build the PIP [Plutonium Immobilization Plant] and convert all of the

plutonium into MOX fuel requires design changes to the proposed MOX facility.

## Rocky Flats Facility

58. The Rocky Flats Environmental Technology Site is located in northern Jefferson County, Colorado, approximately 16 miles northwest of Denver. The main site is a 384-acre complex consisting of more than 700 structures situated within a 6,200-acre buffer zone. Rocky Flats is owned by DOE and operated by Kaiser-Hill, L.L.C. ("Kaiser-Hill") under a performance-based management contract.

59. In August of 1997, DOE designated Rocky Flats as an "Accelerated Closure Pilot Project." In so doing, DOE committed to completing the cleanup and closure of Rocky Flats by 2006 - four years earlier than was anticipated.

60. On August 13, 1998, DOE amended the ROD on storage and disposition of weapons-usable plutonium ROD to provide for the accelerated closure of Rocky Flats. 63 Fed. Reg. 43386 (Aug. 13, 1998). According to DOE, all of the non-pit, weapons-usable plutonium at Rocky Flats would have to be shipped offsite by the end of 2002, two years ahead of the original schedule to achieve the 2006 closure.

61. To meet the 2002 deadline, DOE announced that it would begin shipping plutonium to SRS in early 2000 – prior to the completion of the actinide packing and storage facility. DOE's amended plan was to store the early shipments of non-pit, weapons-usable plutonium from Rocky Flats temporarily in Building 105-K at SRS until construction of the actinide packing and storage facility could be completed.

62. On January 24, 2000, DOE contracted with Kaiser-Hill to complete the cleanup and closure of Rocky Flats. The contract includes complex fee incentives that make Kaiser-Hill's final fee highly dependent on the amount of time and money needed to complete the cleanup and closure.

63.  Robert Card, who was formerly President of Kaiser-Hill, is now Under-Secretary of DOE.

**Congressional Requirement that Secretary Abraham and Governor Hodges Consult**

64.  Congress required in the 2002 Defense Appropriation Act: "The Secretary of Energy shall consult with the Governor of the State of South Carolina regarding any decisions or plans of the Secretary related to the disposition of surplus defense plutonium and defense plutonium materials located at the Savannah River Site, Aiken, South Carolina." Sec. 3155.

65.  Secretary of Energy Abraham and Governor Hodges have consulted about this.

66.  They have been unable to reach an agreement.  On April 15, 2002, Secretary Abraham gave notice to Governor Hodges that shipments of plutonium from Rocky Flats would begin to SRS as earlier as May 15, 2002.

**The DT-22 Shipping Container and the Decision to
Grant a National Security Exemption**

67.  DOE plans to send some of the Rocky Flats plutonium in DT-22 shipping containers.  This is a 170 liter (45 gallon) stainless steel drum with an insulated inner containment vessel manufactured by Lockheed Martin Energy Systems for transporting radioactive materials.

68.  Kaiser-Hill, DOE's contractor for the Rocky Flats site, considers the use of the DT-22 integral to its ability to meet its schedule at Rocky Flats.  According to Kaiser-Hill, the DT-22's relatively large containment vessel will allow classified items to be shipped "as-is," thereby avoiding delays and costs associated with cutting or otherwise reconfiguring the items at Rocky Flats to fit into alternative containers.

69. DOE was unable to certify many of Kaiser-Hill's proposed shipments in DT-22 due to the container's acknowledged inability to pass the dynamic crush test. However, in early 2000 DOE's Rocky Flats Field Office requested a "national security exemption" from DOE headquarters that would authorize Kaiser-Hill to disregard the Nuclear Regulatory Commission's safety regulations and use the DT-22 for a number of shipments from Rocky Flats.

70. On July 19, 2000, after at least one initial request was turned down, DOE headquarters finally granted a national security exemption to allow 125 items to be shipped from Rocky Flats in DT-22 containers. Some of those containers are slated to be sent to SRS.

## CLAIMS FOR RELIEF

**I.     FIRST CLAIM FOR RELIEF – VIOLATION OF NEPA**
**(Lack of sufficient environmental analysis of the**
**decision to undertake long-term plutonium storage at SRS)**

71. The allegations of paragraphs 1-70 are hereby incorporated as if fully set forth herein.

72. The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 - 4370d, requires all federal agencies to consider environmental impacts in their decision-making and to prepare a detailed statement of environmental impacts and alternatives ("environmental impact statement" or "EIS") to the recommended course of action when proposing a major federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332.

73. The Council of Environmental Quality (CEQ) has promulgated NEPA

regulations applicable to all federal agencies and DOE has promulgated supplemental NEPA regulations applicable to it.  40 C.F.R. § 1500 *et al*. and 10 C.F.R. § 1021.100 *et al*., respectively.

74.  DOE NEPA regulations provide:  "DOE shall complete its NEPA review for each DOE proposal before making a decision on the proposal . . . ."  10 C.F.R. § 1021.210(b).

75.  DOE prepared an EIS on surplus plutonium disposition at SRS in November, 1999.  That EIS and the subsequent ROD issued on January 11, 2000 contemplated the treatment of surplus plutonium through immobilization and MOX technologies and the short-term storage of surplus plutonium as a component of the treatment strategy.

76.  The amended ROD under challenge here was issued without any NEPA analysis specifically addressing the decision to make SRS a long-term storage facility for surplus plutonium or making plutonium storage at SRS independent of treatment or canceling immobilization.

77.  DOE claims in its amended ROD of April 19, 2002, that NEPA analysis done for other DOE actions satisfies NEPA compliance for its new decision to make SRS a long-term storage facility for surplus plutonium.

78.  None of that previous analysis was, however, substantial and most of it was done in connection with the proposal to store surplus plutonium at SRS on a short-term basis in preparation for its treatment and removal.

79.  There are numerous problems with using SRS for long-terms storage,

including its location close to surface and ground water, deficient buildings and the absence of important support facilities for long-term storage.

80. The amended ROD of April 19, 2002, is invalid because DOE did not conduct the environmental review required by NEPA of the long-term storage of surplus plutonium at SRS in advance of the decision to do it or the cancellation of immobilization. DOE therefore may not take any action under the amended ROD or previous RODs amended by it, including sending surplus plutonium from Rocky Flats to SRS.

## II.    SECOND CLAIM FOR RELIEF – VIOLATION OF NEPA
### (Failure to prepare a supplemental EIS)

81. The allegations of paragraphs 1-80 are hereby incorporated as if fully set forth herein.

82. Both CEQ and DOE NEPA regulations require a supplemental EIS where substantial changes are made to a proposal for which an EIS was prepared. Specifically, CEQ regulations require a supplemental EIS if "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii). Similarly, DOE NEPA regulations provide: "DOE shall prepare a supplemental EIS if there are substantial changes to the proposal or significant new circumstances or information relevant to environmental concerns . . . ." 10 C.F.R. § 1021.314.

83. The changes made to the plutonium disposition program by the amended ROD (elimination of the immobilization technology for treating plutonium, designation of SRS as the site for long-term storage of plutonium, and making storage at SRS independent of treatment) are substantial and relevant to environmental concerns.

20

84.  The amended ROD of April 19, 2002, is invalid because DOE did not prepare a supplemental EIS, which is required for the changes made.  The storage decision is of sufficient magnitude to require a supplemental EIS on its own and as a component of the surplus plutonium strategy revision from which it cannot be divided for NEPA review. DOE therefore may not take any action under the amended ROD or previous RODs amended by it, including sending surplus plutonium from Rocky Flats to SRS.

**III.     THIRD CLAIM FOR RELIEF – VIOLATION OF PREVIOUS RODS**
**(Rocky Flats surplus plutonium allowed to be stored at**
**SRS only if it is the site for immobilization)**

85. The allegations of paragraphs 1-84 are hereby incorporated as if fully set forth herein.

86. The January 21, 1997 ROD on storage and disposition of surplus plutonium and the amended 1998 ROD on storage and disposition of weapons-usable fissible materials provide that plutonium stored at Rocky Flat may be stored at SRS only if SRS is selected as the site for immobilization.

87.  The April 19, 2002 amended ROD avoided the requirement that surplus plutonium not be sent to SRS unless the immobilization facility was built there by simply canceling that condition.

88.  However, because DOE has eliminated the immobilization program in the amended ROD of April 19, 2002, DOE may not send the Rocky Flats surplus plutonium to SRS unless the two previous RODs requiring immobilization as a condition for sending the surplus plutonium are legally amended or at least an amended ROD on SRS plutonium storage and disposition is validly issued.

## IV.    FOURTH CLAIM FOR RELIEF – VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT
### (Rocky Flats surplus plutonium allowed to be stored at SRS only if it is the site for immobilization)

89.  The allegations of paragraphs 1-88 are hereby incorporated as if fully set forth herein.

90. The Administrative Procedures Act prohibits federal agencies from taking action that is arbitrary, capricious or an abuse of discretion.  5 U.S.C. § 706.

91. Previous DOE actions have connected the storage of surplus plutonium at SRS to its treatment there.  Secretary of Abraham was still making this commitment up until at least April 12, 2002, but on April 19, 2002, DOE abruptly broke this commitment by naming SRS as the site for long-term storage of plutonium and announcing that this storage was independent of any decision on treating the plutonium.

92.  Further, previous RODs made the shipment of surplus plutonium to SRS contingent upon SRS being the site for an immobilization treatment facility.

93.  The amended ROD's abrupt decision's to provide for long-term plutonium storage at SRS and to cancel the condition for shipment of plutonium to SRS that immobilization be done there constitute arbitrary and capricious action.

## V.    FIFTH CLAIM FOR RELIEF – VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT
### (South Carolina was not provided due process in the decision to make SRS the site for long-term storage of plutonium)

94.  The allegations of paragraphs 1-93 are hereby incorporated as if fully set forth herein.

95. The Administrative Procedures Act prohibits federal agencies from taking action without providing due process.  5 U.S.C. § 706.

96. By making long-term storage of surplus plutonium at SRS independent of its treatment there, and canceling the condition for the transfer of plutonium to SRS that immobilization be located there without providing South Carolina notice and opportunity to comment, DOE has violated due process, thereby rendering the amended ROD invalid.

## VI.    SIXTH CLAIM FOR RELIEF – VIOLATION OF THE ADMINISTRATIVE PROCEDURES ACT

### (DOE's issuance of a national security exemption for the surplus plutonium transportation is illegal)

97. The allegations of paragraphs 1-96 are hereby incorporated as if fully set forth herein.

98. DOE's decision to grant a national security exemption to facilitate the shipment of surplus plutonium from Rocky Flats to SRS was motivated not by national security but rather by the desire to accelerate the closure of Rocky Flats. DOE's decision was therefore arbitrary, capricious and an abuse of discretion and is therefore illegal.

## REQUEST FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court:

1.    Enter a declaratory judgment that the amended ROD of April 19, 2002 violates the National Environmental Policy Act, 42 U.S.C. 4321-4370d and the Administrative Procedures Act, 5 U.S.C. §§553-557.

2.    Preliminarily and permanently enjoin defendants from sending any surplus plutonium from Rocky Flats or anywhere else to SRS unless and until DOE complies with applicable law.

3.    Enter a declaratory judgment that the national security exemption granted for the shipment of DT-22 containers from Rocky Flats is invalid.

4.    Provide any such other appropriate relief.

Respectfully submitted,

*William L. Want*
_____
William L. Want
Federal ID # 4987
171 Church St., Suite 300
Charleston, S.C. 29401
(843) 723-5148

Lionel S. Lofton
Federal ID #2711
Post Office Box 449
Charleston, S.C. 29402
(843) 722-6319

Stephen P. Bates
Federal ID # 5414
Chief Legal Counsel
Office of the Governor
P.O. Box 11829
Columbia, SC 29211
(803) 734-6313

May 1, 2002